# GOLD *v.* GOLD. (3)

PATENTS; INTERFERENCE; FORMER ADJUDICATION; APPEALS.

1. A former decision of the Patent Office against the patentability of claims, made on motion of one of the parties in interference to dissolve on that ground, is not conclusive of the right of the commissioner to reconsider the question of patentability of the applications of the parties, *ex parte*, and then to renew the interference formerly dissolved. (Distinguishing *United States ex rel. Newcomb Motor Co. v. Moore*, 30 App. D. C. 464, and citing *Seymour v. United States*, 10 App. D. C. 567; *Re Barratt*, 14 App. D. C. 255; *Re Fay*, 15 App. D. C. 517; *Podlesak v. McInnerney*, 26 App. D. C. 399; *Sobey v. Holsclaw*, 28 App. D. C. 65; *Blackford v. Wilder*, 28 App. D. C. 535; *Johnson v. Mueser*, 29 App. D. C. 61; *Horine v. Wende*, 29 App. D. C. 415; *Re Edison*, 30 App. D. C. 321; *Carroll v. Hallwood*, 31 App. D. C. 165; and *Re Fullagar*, 32 App. D. C. 222.)

2. When all of the tribunals of the Patent Office have concurred in holding—especially in a case involving somewhat complicated mechanical means—that the invention claimed is not disclosed in the description of a party's invention, error must be very clearly shown in their conclusions to justify a reversal. (Following *Stone v. Pupin*, 19 App. D. C. 396; *Seeberger v. Dodge*, 24 App. D. C. 476; and *Kilbourn v. Hirner*, 29 App. D. C. 54.)

No. 615.   Patent Appeals.   Submitted November 17, 1909.   Decided December 16, 1909.

HEARING on an appeal from a decision of the Commissioner of Patents in an interference case.                *Affirmed.*

The facts are stated in the opinion.

*Mr. Otto R. Barnett* for the appellant.

*Mr. William A. Redding* and *Mr. Arthur C. Fraser* for the appellee.

Mr. Chief Justice SHEPARD delivered the opinion of the Court:

This is an interference proceeding involving priority of invention of a steam heating system, in an issue of twelve counts as follows:

"1. In combination, an admission pipe carrying a supply of steam at pressure greater than atmospheric, and a steam heating system taking steam from said admission pipe and circulating it, and including thermostatically controlled means for determining whether it shall be circulated at admission pipe pressure or at approximately atmospheric or lower pressure, and for automatically maintaining it at such determined pressure.

"2. A steam heating system including in combination an admission valve and an exhaust valve, both under automatic control and adjustable by hand to cause a circulation of steam at a high pressure or at a low pressure, at will.

"3. In combination, an admission pipe for carrying a supply of steam at high pressure, and a steam heating system including in combination an admission valve for taking steam from said admission pipe, and an exhaust valve, both under automatic control by the temperature beyond the exhaust valve, and each adapted to be held open so as to cause a circulation at high or low pressure at will.

"4. A steam heating system including in combinatian an admission valve and an exhaust valve, both under automatic control by a single controller and adjustable by hand to cause a circulation of steam at a high pressure or a low pressure, at will.

"5. A steam heating system including in combination an admission valve, and exhaust valve, both said valves being under automatic control, and hand-operated means for opening the exhaust valve and neutralizing the automatic control thereof.

"6. A steam heating system including in combination an admission valve, an exhaust valve, both said valves being under

automatic control, and means for neutralizing such control of the admission valve.

"7. A steam heating system including in combination an admission valve, an exhaust valve, both said valves being under automatic control by the steam, and means for neutralizing such control of either of said valves at will.

"8. A steam heating system including in combination an admission valve, an exhaust valve, both said valves being under automatic control, and hand-operated means for opening one of said valves, and thereby neutralizing automatic control thereof.

"9. In combination, an admission pipe for carrying a supply of steam at a high pressure, and a steam heating system including an admission valve under automatic control, an exhaust valve, means for holding the admission valve, and hand-operated means for holding the exhaust valve open when the admission valve is under automatic control.

"10. In combination, an admission pipe carrying a supply of steam at pressure, greater than atmospheric, and a steam heating system including an admission valve and an exhaust valve, both under automatic control, and means for converting said system into an admission pipe-pressure system, or an atmospheric-pressure system at will.

"11. In combination, an admission pipe carrying a supply of steam at pressure greater than atmospheric, and a steam heating system including an admission valve and an exhaust valve, both under automatic control by a single controller, and means for converting said system into an admission pipe-pressure system or an atmospheric pressure-system at will.

"12. In combination, an admission pipe carrying a supply of steam at pressure greater than atmospheric, and a steam heating system including an admission valve and exhaust valve, both under automatic control by the temperature beyond the exhaust valve, and means for converting said system into an admission pipe-pressure system or an atmospheric-pressure system at will."

Edward E. Gold, the senior party, filed his application July 16th, 1904. Egbert H. Gold filed his on February 11, 1905.

A first interference was declared between the parties October 3, 1905, and each moved to dissolve. The grounds of Edward E. Gold's motion were: (1) That Egbert H. Gold had no right to make the claims involved, in view of certain patents referred to; (2) that the claims are not patentable to Egbert H. Gold in view of those patents. Egbert H. Gold moved to dissolve on the ground that the subject-matter of each of counts 1, 2, 3, 6, 7, 8, 9, is unpatentable in view of the prior art, as shown in a number of patents cited.

On March 15th, 1906, the Primary Examiner dissolved the interference on the following grounds, stated in his decision: (1) Irregularity in the declaration of the interference; (2) that the counts of the issue are not patentable to Egbert H. Gold; (3) that counts 1, 2; 3, 6, 7, 8, and 9 are not patentable. He added that the question of the patentability of counts 4 and 5 to Edward E. Gold had not been raised by either motion. Neither party appealed from this decision. *Ex parte* consideration was then resumed. Edward E. Gold's application was then rejected as to all claims except 4 and 5, on the ground that the former decision was final. He then amended, substituting a new set of claims. These were rejected, save as to three, on the ground that they had become *res judicata* by the former decision on the motion to dissolve. On appeal to the Examiners-in-Chief they reversed the Examiner on all the claims but No. 1. Applicant then erased No. 1, and the present interference was declared with the same application of Egbert H. Gold, and the contest was renewed. Both parties again moved to dissolve. The grounds of Edward E. Gold's motion were: (1) That the claims are not patentable to E. H. Gold in view of former patents issued to him; (2) that he had no right to make the claims.

The grounds of Egbert H. Gold's motion were: (1) That Edward E. Gold had no right to make the claims; (2) that the claims are not patentable as to him in view of certain patents cited. The Examiner denied both motions. Testimony having been taken, the interference was heard by the Examiner of Interferences, who found the following facts: Edward E.

Gold conceived the invention June 30th, 1904, but made no actual reduction to practice, and was entitled to constructive reduction to practice by virtue of his application filed July 16th, 1904. That Egbert H. Gold conceived the invention in February, 1904, but made no actual reduction to practice. That Egbert H. Gold failed to use diligence in reducing to practice either actually or constructively. Without considering whether Egbert H. Gold had disclosed the invention, as claimed in his patent No. 771,628, applied for June 27th, 1904, and patented October 4th, 1904, for an adjustable low pressure heating system, he followed the decision of the Primary Examiner on that point. He declined also to consider the question of the patentability of the issue, and on the facts found awarded priority to Edward E. Gold. Appeal was taken to the Examiners-in-Chief. These agreed with the Examiner as regards the conception of the parties, respectively, and the failure of diligence on the part of Egbert H. Gold. Taking up, first, the question of the patentability of the issue, not as a subject-matter of appeal, but under the power conferred by rule 126, they refused to recommend to the Commissioner a denial thereof. They stated that two systems of heating had long been in use: First, the atmospheric pressure system in which the radiators are substantially open to the atmosphere at the exhaust end, and the admission of steam from the train pipe is controlled by an admission valve; second, the train pipe pressure system, in which the radiator is practically open to the train pipe at all times, and the exhaust controlled by a valve open only when necessary to drain off the water of condensation. In each system the valve is controlled by a thermostat in the outlet. The invention of the interference is an interconvertible system combining the two described; that is to say, a system in which, by a manipulation of parts, it may be converted at will to either an atmospheric pressure system, or a train pipe pressure system. The subject-matter was held to be patentable, and, while the specific descriptions of the parties differed, each disclosed the issue.

They next took up the question upon which, under the facts

previously found, the final award of priority must depend. That is whether Egbert H. Gold's former application of June 27th, 1904, upon which his patent No. 771,628 had been issued, disclosed the invention of the present issue. Having made an analysis of the invention, as disclosed in the specifications of the patent, they gave a negative answer to the question. They noted the obstacle to the contention of disclosure of the present invention in that patent as consisting in "interposing in the system a yielding and preferably and adjustable obstruction, whereby the heating medium is kept from operative relation with the thermostat which controls the operation of the inlet valve." Regarding this they said: "Were it possible to adjust the pressure controlling valve to the tightly closed position, or to withdraw it to such an extent that the spring would be in operation, to do so would entirely change the character of the device. It would in fact destroy the very element which the patentee has described as the essence of his invention, to wit, the yielding obstruction. The system so changed would constitute a new means, having an entirely different principle of operation. It may be granted that the mechanical change involved is but slight, but we are clearly of the opinion that invention was involved in the conception of the idea of means." In accordance with this conclusion they affirmed the decision in favor of Edward E. Gold. Egbert H. Gold then appealed to the Commissioner. It may be remarked here that he concedes the findings of the tribunals in respect of the dates of conception, and of his want of diligence. His appeal involved two points. The first relates to the patentability of the issue, and his contention is that this question had been finally adjudicated on the original motion to dissolve the interference, and was therefore conclusive as between all of the parties. The second relates to the disclosure of his patent No. 771,628.

The first question was raised by a special petition to the Commissioner, which was heard in connection with the appeal. The Commissioner denied the effect claimed for the former adjudication, and then, in a decision on the question of disclos-

ure in the patent aforesaid, affirmed the decision of the Examiners-in-Chief.

From that decision Egbert H. Gold has prosecuted this appeal on both points.

1. It is the settled doctrine of this court that the allowance of a claim in the Patent Office is conclusive of the question of patentability in an interference proceeding, because the appellate jurisdiction in respect of patentability is limited to cases where claims have been rejected on that ground. *Johnson* v. *Mueser,* 29 App. D. C. 61–64, and cases cited; *Dunbar* v. *Schellenger,* 29 App. D. C. 129–140. But whether a former adjudication against the patentability of claims, made on motion of one of the parties in interference to dissolve on that ground, is conclusive of the right to reconsider the question of patentability of the several applications, *ex parte,* and then to renew the interference formerly dissolved, is a question that has not been decided.

As we have seen, the first motion to dissolve, from the decision on which no appeal was taken, was granted on the ground that the claims in the issue of the interference were not patentable at all in view of the prior art. Two claims of the issue were not included in that adjudication, as they were not embraced in the motion. As the result of the order of dissolution, each applicant was referred back to the Primary Examiner for separate action. The ordinary result of this would be the final rejection of the claims of both parties which had been held unpatentable. Edward E. Gold amended his claims and demanded reconsideration. The Examiner rejected them, but on appeal to the Examiners-in-Chief they were allowed. Egbert H. Gold's application was also reconsidered, and the interference was redeclared. Notwithstanding the amendments referred to, the new claims are not essentially different from the old ones.

It is also settled that where an application has been finally rejected by the Commissioner in an *ex parte* proceeding, that adjudication may be relied on by him as conclusive on a second application for the same invention. *Re Barratt,* 14 App.

D. C. 255–261; *Re Fay,* 15 App. D. C. 517; *Re Edison,* 30
App. D. C. 321–323. A qualification of this doctrine was in-
dicated by the following language in the opinion by Justice
Morris in Barratt's Case: "In what we have said we do not
desire to be understood that the Patent Office may not, if it
thinks proper so to do, entertain and adjudicate a second ap-
plication for a patent after the first application has been re-
jected. What we decide. is, that it is not incumbent upon the
Office, as a duty, to entertain such applications, and that, if it
refuses to entertain them, it has a perfect legal right so to do.
An applicant is not legally aggrieved by such refusal." There-
fore, in so far as the public interest, of which the Commissioner
is the representative, was concerned, it seems that he had the
power to permit this reconsideration and allowance. The doc-
trine of *res judicata* necessarily applies in. favor of the suc-
cessful party to an interference to whom an award of priority
has been made, against his opponent's attempt to renew the
interference upon a new application with claims for the same
invention, although in different or broader form. *Blackford* v.
*Wilder,* 28 App. D. C. 535–545; *Horine* v. *Wende,* 29 App.
D. C. 415–428; *Carroll* v. *Hallwood,* 31 App. D. C. 165–
172.

While the question of the patentability of the issue will not
be entertained on appeal from an award of priority, the right
of one of the parties to make the claims, under the disclosures
of his application, will be entertained as an ancillary ques-
tion, for the reason that "if it be incorrectly held that such
party has a right to make the claim, priority may be awarded
to him, and his adversary be deprived of a substantial right, in
that he is not given a claim where he necessarily is the prior
inventor, his adversary never having made the invention." *Podle-
sak* v. *McInnerney,* 26 App. D. C. 399–405. As a consequence
of the doctrine established by that case, it has been held that
where an interference has been dissolved on that ground, with-
out appeal from the decision, this right to make the claim must
be considered *res judicata* in a later interference between the
parties on the same applications. *United States ex rel. New-*

*comb Motor Co.* v. *Moore,* 30 App. D. C. 464–476. In that
case Newcomb had received a patent, but before its issue Thompson and others had applications pending in the Office, the claims
of which did not conflict with Newcomb's. Hence no interference had been declared. When the parties saw Newcomb's
patent they amended by copying every one of its claims. Interferences having been declared between the amended applications and the patent, Newcomb moved to dissolve on the ground
that his opponents had no right to make those claims under the
disclosures of their applications. The motion was sustained by
the Examiner, and the opponents took an appeal to the Commissioner, which they thereafter abandoned. After withdrawing their appeals they proceeded *ex parte* and secured another
allowance of their claims, as being within the disclosures. The
interference was then again declared. Newcomb moved to dissolve on the ground that the question of his opponents' rights
to make the claims was concluded by the judgment on his first
motion. This contention was sustained on a petition for mandamus to the Commissioner to compel him to give effect to the
former judgment and vacate the later proceedings for interference. That case is relied on by appellant as governing the
question under present consideration. We cannot agree with
the contention. The question of the right of one of the par-
·ties to make claims is inseparably connected with that of prior-
ity. When adjudged that one of the parties had no right to
make the claims,—in other words, that his description fails
to show a conception of the invention of the issue,—the other,
who thereby appeared to be the sole inventor, was necessarily
entitled to the award and to his patent. The effect of the deci-
sion is to establish his right of property in the invention, and
he is entitled to the benefit without further impeachment of
that right by his adversary in renewed litigation in the Pat-
ent Office. If the losing party can go back to the Examiner,
and, proceeding *ex parte,* secure an allowance of his right to
make the. claims, and then renew the litigation with his ad-
versary, there might be no end to it. It is to meet conditions
of the kind that the salutary doctrine in respect of the con-

clusiveness of former judgments has been applied in proceedings in the Patent Office. On the other hand, the patentability of a described invention is a question that arises on each application when presented, and is necessarily determined *ex parte.* It is only when patentability has been allowed in the *ex parte* proceeding that an interference with a like application of another can be declared. This allowance is not appealable. It is true that the patentability of the claims of an issue in interference may be questioned in a motion to dissolve. Patent Office rule 122. Why this is permitted by the rule we do not understand, unless it be to enable the Commissioner to reexamine the question in the light of argument, and put an end to useless litigation if he find that an allowance of patentability ought not to have been made in the first instance. So finding, he acts for the protection of the public from an unauthorized monopoly, and dissolves the interference so that each application may be rejected. The decision determines no right between the two opponents, but one between them both on one side, and the public on the other. If either desire to appeal from the final order of rejection, he must do so *ex parte* in regular course of procedure. *Re Fullagar,* 32 App. D. C. 222–229; *Sobey* v. *Holsclaw,* 28 App. D. C. 65–82. That the question is to be considered as one between the public and the parties, and not between the latter, is also evidenced by the provisions of rule 126, which authorizes the Examiner of Interferences and the Examiners-in-Chief to direct the attention of the Commissioner to matters not relating to priority. Moreover, the Commissioner may, with or without such direction or attention, raise the question of patentability of his own motion, and send the application back for rejection without deciding the question of priority; or he may, after the question of priority has been determined, reject the application of the successful interferant, and put him upon an *ex parte* appeal. *Sobey* v. *Holsclaw,* supra; *Seymour* v. *United States,* 10 App. D. C. 567. We must hold that the question of patentability was not concluded by the decision on the original motion to dissolve the interference on that ground.

2. The remaining question is whether the subject-matter of the issue is disclosed in patent No. 771,628, for, if it is, Egbert H. Gold is entitled to the filing date of the application for that patent for constructive reduction to practice, and, consequently, to the award of priority, as it has been found that he was the first to conceive the invention.

The point has been fully and ably considered in the decisions of the several tribunals of the Office, and we find no occasion for adding to the discussion. When all of these expert tribunals have concurred in holding—especially in a case involving somewhat complicated mechanical means—that the invention claimed is not disclosed in the description of a party's invention, error must be very clearly shown in their conclusions to justify a reversal of the same. *Seeberger* v. *Dodge,* 24 App. D. C. 476–481; *Kilbourn* v. *Hirner,* 29 App. D. C. 54–57; *Stone* v. *Pupin,* 19 App. D. C. 396–400.

It is sufficient to say that no such error has been shown. The decision will therefore be affirmed. It is so ordered, and that this decision be certified to the Commissioner of Patents as required by law.  *Affirmed.*

A petition for a rehearing was denied January 5, 1910.