**GYRO PROCESS CO. v. COE, Commissioner of Patents.**

**No. 7191.**

United States Court of Appeals for the District of Columbia.

Decided Aug. 7, 1939.

196

Ralph H. Hudson, of Washington, D. C., and Thomas E. Scofield and Henry L. Shenier, both of Kansas City, Mo., for appellant.

R. F. Whitehead, Solicitor, United States Patent Office, for appellee.

Before STEPHENS, MILLER, and EDGERTON, Associate Justices.

STEPHENS, Associate Justice.

This is an appeal from a decree of the District Court of the United States for the District of Columbia dismissing, after a hearing on the merits, a bill in equity seeking under Rev.Stat. § 4915, 35 U.S.C. A. § 63, an order authorizing the appellee Commissioner of Patents, hereinafter referred to as the Commissioner, to issue a patent to the appellant Gyro Process Company, for a process of cracking hydrocarbon oil. The dismissal was based upon lack of patentability over the prior art and upon res adjudicata held to arise from two decisions within the Patent Office. The claims involved in the case are Nos. 31, 32 and 33 of an application filed by Clive M. Alexander April 5, 1924, and assigned by him to the Pure Oil Company and by the latter to the appellant.

The Alexander process may be explained by reference to Illustration 1. Oil such as a heavy hydrocarbon is introduced into coil 46 in a furnace 31 where it is heated to vaporizing temperature. It is then introduced into chamber 40 where the resulting vapors are separated from the unvaporized portion. The latter is then passed into reaction chamber 43. The vapors ascend through vertical pipe 6 into pipes 5 located in another furnace and are there further heated until cracking occurs. The cracked vapors then descend through vertical pipe 7 and are introduced into reaction chamber 43. They are still sufficiently hot, when they thus come into contact with the unvaporized oil introduced as above described into the reaction chamber, to cause cracking to occur in this oil without the application of additional heat. All of the cracked gases, i. e., those produced in the vapor phase cracking as well as those from the liquid-phase cracking, then pass out of the chamber 43, through fractionating column 22, and then through condenser 26.

The facts relating to the rulings upon the ground of res adjudicata are as follows: In ex parte proceedings on Alexander's application, claims 1–11 were allowed and claims 23–30 rejected. This rejection was affirmed by the Board of Appeals and was not thereafter attacked either by an appeal to the Court of Customs and Patent Appeals or by a bill in equity. Alexander then amended his application to cancel all claims except 1–11 and to add claim 31, and entry of this amendment was allowed. There was at this time pending an interference involving applications of Murphy, Seguy, and Tuttle, the latter being owned by the appellant. Through Tuttle the appellant mov-

Illustration 1

ed to bring the Alexander application into interference with the other parties, Murphy and Seguy, and proposed a count to this end. The Examiner of Interferences denied this motion upon the ground that the proposed count was unpatentable over the prior art and ruled, upon his own motion, that claim 31 was unpatentable as substantially the same as the proposed count. Also the Examiner dissolved the interference upon the ground that the count therein was not patentably distinct from the proposed count, and was itself therefore not patentable over the prior art. No appeal was taken from these rulings. Alexander in ex parte proceedings then moved to add claim 32 to his application and asked that a patent be issued on claims 1–11, 31 and 32. The Primary Examiner rejected claims 31 and 32. Alexander then moved to add claim 33 and requested reconsideration of the rejection of claims 31 and 32; but the Primary Examiner rejected claim 33 and denied the request for reconsideration.[1] These rulings were affirmed by the Board of Appeals.[2] This final ruling rejecting all three of the claims, 31, 32 and 33, is the subject of the present suit.

In dismissing the bill the trial court held that: (1) claims 31, 32 and 33 were substantially the same as claims 23–30, and the applicant was therefore in respect of them estopped by failure to appeal from the earlier affirmance ·by the Board of Appeals of the rejection of claims 23–30; (2) the appellant was estopped as to claims 31, 32 and 33 by failure to appeal from the decision of the Examiner of Interferences "holding claim 31 of the Alexander application unpatentable"; (3) claims 31 and 32 were not patentable over the patent to Ruff, No. 1,325,582, in view of the patent to Egloff and Benner, No. 1,835,765; (4) claim 33 was not patentable over the patent to Knox, No. 1,428,641. Each of these four holdings is assigned as error.[3]

1. In the fifth assignment the appellant asserts that the trial court erred: "In holding and deciding that the Gyro Process Company is estopped to prosecute in the Alexander application assigned to it, Claims 31, 32 and 33 because of the failure to seek a review of the first decision of the Board of Appeals in the Alexander application." The decision of the Board of Appeals here referred to is the decision affirming the Examiner's rejection of claims 23–30.

For reasons hereinafter stated we hold that claims 31 and 33 are unlike claim 24 (taken as typical of claims 23–30) and are therefore not barred by the rejection of claim 24 and the failure to appeal therefrom. We hold claim 32 to be like claim 24 and hence barred. There would be no end of Patent Office proceedings if the failure to appeal from the final rejection of one claim were not a bar to subsequently presented similar claims. The appellant contends that claim 32 differs from claim 24 because of the limitation in the former of heating the oil in an "elongated confined stream," and the further limitation of "flashing the oil into vapors and unvaporized oil." We think neither of these limitations differentiates claim 32 from claim 24. The specification discloses that heating the oil in an elongated confined stream is simply heating it in a coil. The use of a coil in the heating step of the process does not patentably differentiate the process from one wherein the heating step might be performed by any other suitable means—so long as the result is heating to vaporization temperature. In respect of flashing: An examination of the briefs and specification reveals that that term, as used in claim 32, is synonymous with the phrase

[1] The rejection of claims 31 and 32 was upon the ground that they were substantially the same as the proposed count of the interference, the ruling as to unpatentability of which was held to be res adjudicata by virtue of the dissolution of the interference, and also upon the ground that these two claims were unpatentable over the prior art. Claim 33, which had been drawn to avoid the prior art cited to claims 31 and 32, was rejected upon the ground that it was substantially claim 24—the unpatentability of which was held to be res adjudicata by virtue of its rejection, and the affirm-

ance thereof by the Board of Appeals—and also upon the ground that it was unpatentable over the prior art. Claim 24 was taken to be typical of claims 23–30.

[2] The Board of Appeals adopted the reasoning of the Primary Examiner but rejected claims 31 and 32 upon the further ground of res adjudicata by virtue of the earlier rejection of claims 23–30, this upon the theory that claims 31 and 32 as well as claim 33 were substantially identical with claim 24.

[3] Of seventeen errors assigned we consider only those argued in the briefs, to wit, the fifth, seventh, eighth and ninth.

"to vaporize portions of said oil" in claim 24. It is not used in the technical sense of "flashing" as a term of art.[4] The appellant contends, upon the theory that claims 31 and 24 were in substance the same, that allowance of claim 31 by the Examiner operated as a reversal of the rejection of claim 24 and thus removed the bar of res adjudicata. Since we hold that claim 31 differs from claim 24, we need not decide the correctness of this contention.

We think that claims 31 and 33 differ from claim 24 in that they state that reduction of unvaporized oil to a heavy residue is accomplished by "the sensible heat" of the cracked vapors. The omission of this limitation in claim 24 makes the latter so broad as to permit the use of external heat. The accomplishment of cracking in the liquid phase without the use to any substantial extent of heat other than the "sensible heat" of the cracked vapors is one of the salient features of Alexander's process. We think therefore that the appellant was entitled to have claims 31 and 33 compared with the prior art and not merely rejected because similar to claim 24.

2. In the seventh assignment the appellant asserts that the trial court erred: "In holding and deciding the Gyro Process Company is estopped to prosecute in the Alexander application assigned to it Claims 31, 32 and 33 because of its failure to prosecute an appeal in the Patent Office from the decision of the Examiner of Interferences in Interference No. 67,970, Murphy vs. Seguy vs. Tuttle, holding Claim 31 of the Alexander application unpatentable."

While the ruling of the trial court refers to the decision of the Examiner of Interferences holding Alexander's claim 31 unpatentable, we think that the Patent Office ruling actually involved was that which, for the reason that in the Examiner's view the proposed count was unpatentable over the prior art, denied the motion to add Alexander to the interference. Since the motion to add Alexander had been denied, the patentability of claim 31 was not before the Examiner; and since Alexander was not added to the interference, the Examiner's dissolution thereof upon the ground of unpatentability of the count of the interference itself did not involve Alexander.

We think that the appellant was not "estopped" by failure to prosecute an appeal within the Patent Office from the decision of the Examiner of Interferences denying, upon the ground referred to above, the motion to add Alexander. In Gold v. Gold, 1909, 34 App.D.C. 229, the applications of Edward Gold and Egbert Gold were involved in an interference which was dissolved upon the ground, among others, that the issue was not patentable over the prior art. Neither party appealed, but each applicant was referred back to the Primary Examiner for separate action. Edward Gold then amended his claims and they were reconsidered and allowed by the Examiner in Chief. Egbert Gold's application was also reconsidered, and the interference was then re-declared. The new claims were not essentially different from the old ones. After a hearing in the interference thus re-declared, the decision was in favor of Edward Gold. Egbert Gold then appealed to the Commissioner, urging as one ground of appeal that the question of patentability of the issue had been finally adjudicated upon the original motion to dissolve and was therefore concluded as between the parties. The Commissioner denied the effect thus claimed for the former decision and affirmed the ruling in favor of Edward Gold. Egbert then prosecuted an appeal to this court which held that:

"The decision determines no right between the two opponents, but one between them both on one side, and the public on the other. If either desire to appeal from the final order of rejection, he must do so *ex parte* in regular course of procedure. . . . We must hold that the question of patentability was not concluded by the decision on the original motion to dissolve the interference on that ground." [34 App.D.C. at page 238]

Since this is the rule in respect of dissolution of an interference upon the ground of unpatentability of the count, a fortiori it is the rule in respect of the denial, on the ground of unpatentability of the proposed

---

[4] The word "flashing" as a technical term in the oil cracking art is descriptive of a process of immediate vaporization accomplished by sudden decrease of pressure upon oil heated almost to the vaporization point. See Sachanen and Tilicheyev, Chemistry and Technology of Cracking (1932) 305. The Alexander specification does not describe such a step.

count, of a motion to add an application to an interference.

The Commissioner contends that the real reason for the decision in Gold v. Gold was that the Patent Office had there voluntarily reconsidered the applications. Be that as it may, we think that in this jurisdiction the law has since been recognized to be as it was stated in the final holding of the court in Gold v. Gold above quoted. In American Cable Co. v. John A. Roebling's Sons Co., 1933, 62 App.D.C. 168, 65 F.2d 801, an interference had been dissolved upon the ground of unpatentability of the issue over the prior art, and this was affirmed by the Board of Appeals. Upon the theory that this decision was a refusal of the patent, an attack was attempted by a bill in equity. The bill was dismissed and there was an appeal to this court. It was insisted by the appellant that "inasmuch as the decision is based upon the unpatentability of the claims involved, it is equivalent to a refusal of a patent within the meaning of section 4915." We held to the contrary, saying:

"We are not impressed with this contention. An interference proceeding is solely to determine the issue of priority, and the only final order that can be entered in such a proceeding is a determination of the question of priority. Motions to dissolve or to add counts go to the determination of whether or not the interference is properly declared. A decision, therefore, on such motion is purely interlocutory. In Carlin v. Goldberg, 45 App.D.C. 540, this court held as follows: 'A motion to dissolve is interlocutory, and appeal will not lie to this court from an order thereon. The question of priority cannot be determined in proceedings purely upon the motion, for the elementary reason that, if the motion is denied, the soundness of the ruling is a question ancillary to the final judgment of priority, and may be considered on an appeal from the final order of priority (Podlesak v. McInnerney, 26 App.D.C. 399); while, if the motion be sustained, it ends the interference and no cause of action survives or exists upon which an order of priority can be based.'

"When the interferences were dissolved appellants were reinstated to the status of ex parte applicants as to all claims excepting the two which were allowed, and which are involved in the redeclared interference. The only action taken by the primary examiner was to redeclare the interference on the two claims. He has not rejected the claims excluded from the interference. Under rule 134 two rejections of appellants' claims are required before they will have the right to an ex parte appeal to the Board of Appeals. We cannot assume that a patent will ultimately be refused by the primary examiner since new evidence may be presented. In other words, a new case on the claims considered by the Board of Appeals in the interference may be made before the primary examiner, and the primary examiner in that instance would not be bound by the decision of the Board of Appeals, since it acted solely upon the motion to dissolve the interference." [62 App. D.C. at pages 169, 170, 65 F.2d at pages 802, 803]

It will be noted that in this case the ruling of the Examiner of Interferences that the issue was not patentable had been affirmed by the Board of Appeals on an appeal directly from that ruling, whereas in the instant case, as in Gold v. Gold, no appeal was taken from the ruling of the Examiner of Interferences. But we think this distinction immaterial in view of the quoted reasoning to the effect that the decision of the Board of Appeals itself was not final on the question of patentability of the issue.

We are aware of the ruling in Lothrop v. Robertson, 1932, 61 App.D.C. 252, 61 F. 2d 404. In that case an interference had been dissolved upon the ground of unpatentability of the counts over the prior art, and one of the parties then sought an ex parte ruling upon the patentability of claims which were substantially the same as the counts. The Examiner held that the claims were barred by the decision in the interference proceeding. The Board of Appeals and this court affirmed, holding that unpatentability of the claims was res adjudicata. Gold v. Gold was not cited. No reference was made in American Cable Co. v. John A. Roebling's Sons Co. to either Gold v. Gold or Lothrop v. Robertson; but the American Cable Co. case, in effect, affirms Gold v. Gold and, being the latest of the three cases, settles the law. Lothrop v. Robertson must be taken as overruled so far as inconsistent.

■ 3. In the eighth assignment the appellant asserts that the trial court erred: "In holding and deciding Claims 31 and 32 are not patentable over the patent to

Ruff, No. 1,325,582, in view of the patent to Egloff 1,835,765."

It is agreed that the patent to Egloff may be disregarded since it was referred to only to add a dephlegmator—which is indisputably old—to Ruff.

Since we hold, as above stated, that the rejection of claim 24 barred claim 32, it is not necessary to discuss the latter further.

In respect of claim 31: We disagree with the holding of the trial court that this claim is not patentable over Ruff. The Ruff process may be explained by reference to Illustration 2. Liquid petroleum er, and through the liquid residue in direct contact therewith. The effect of this is to remove from the gases the carbon particles which have been produced in the cracking process. From the washer 12 the gases pass out through pipe 15.

The Ruff process is in our view plainly different from that which Alexander claims. An expert witness for the appellant testified at the trial:

"The significant differences between the Ruff patent and the Alexander application are the separation of the vapors from the unvaporized oil and cracking of the vapors in a separate chamber where temperature

## Illustration 2

is heated to vaporizing temperature in a coil 3 in a furnace. It then passes into chamber 4 which has been preheated by means of a burner 5, extinguished before the petroleum is introduced into the chamber. Directly opposite the point at which the petroleum enters this chamber, steam or hot fixed gas (such as hydrogen, methane or ethane) is introduced through pipe 6 and this gas, coming into contact with the heated petroleum, cracks a part of it. Liquid residue from this process collects at the bottom of chamber 4 and passes down through pipe 13 into chamber 12. The gases pass upward through chamber 4, and as they rise are subjected to further heating and cracking by steam or gas introduced by means of pipes 9 leading from the same source as pipe 6. The cracked vapors pass out and down through pipe 11 into chamber 12, referred to as a wash-

is accurately controlled, and the subsequent contacting of the cracked vapors with the unvaporized oil to produce a heavy residue. The Ruff patent vaporizes and cracks in a single stage and produces a heavy residue in that stage. Alexander separates the vapor from the liquid in one stage, cracks the vapor in a separate stage and contacts the liquid and vapor in a third stage. There is no contacting of any cracked vapor with the unvaporized oil to produce a heavy residue material in Ruff."

Comparison of the Ruff process with the claims of Alexander, read in the light of his specification, confirms the accuracy of this statement.

■ 4. In the ninth assignment the appellant asserts that the trial court erred: "In holding and deciding that Claim 33 is not patentable in the Alexander application in view of the Knox patent 1,428,641."

The Knox process may be explained in terms of Illustration 3. So far as pertinent to the present discussion it is as in pipe 29 and is cracked therewith in heater 25. After passing through reaction

### Illustration 3

follows: A charging stock such as kerosene is introduced into cylinder 19 called an evaporator. Inside this cylinder is another cylinder 38 through which hot cracked vapors pass as explained below. The inner cylinder 38 is honey-combed by tubes through which the liquid oil may circulate without coming into direct contact with the gas. By this means the heat of the gas serves to heat the liquid oil. From evaporator 19 the liquid oil passes through pipe 20 to a similar evaporator 21, wherein it is in similar manner further heated. The hot liquid oil leaves evaporator 21 by pipe 22 through which it enters reaction chamber 23. Natural gas or casing head gas is introduced through pipe 26, shown at the top of the diagram, whence it is carried through pipe 29 to a heater 25 where it is heated until cracked. This hot cracked gas then passes through pipe 24 to the reaction chamber 23 where it comes into direct contact with the unvaporized oil from evaporator 21 and by its own heat cracks this oil. The cracked vapors from the reaction chamber 23 pass out through pipe 36 and thence through inner cylinder 38 of evaporators 21 and 19, initially heating the liquid oil in the evaporators as above described. As the oil in the evaporators is heated it is in part vaporized, and this vapor passes from the evaporators through pipes 42 and 43 and is thus added to the natural gas or casing head gas

chamber 23 and evaporators 21 and 19, the cracked gases are condensed in chambers 47 and 59.

We think the ruling of the trial court that claim 33 of Alexander was anticipated by Knox is correct. The appellant contends that the Alexander process differs from that of Knox in three respects: First, it is said that there is no step in Knox corresponding to separating the heated oil into vapors and unvaporized oil in a zone in which substantially no heat is supplied, as in Alexander. This difference is in our view not important. In both Knox and Alexander the oil is heated to a point of partial vaporization and the vaporized and unvaporized portions separated; and in both processes this separation is essential since the vapor phase and liquid phase cracking processes are separately carried out. Since it is the separation that is essential, it is not material as a distinction that in Knox the separation takes place in the heating portion of the process and apparatus, while in Alexander it takes place in a zone which is itself not heated but into which flows the heated oil.

The appellant relies, second, upon the fact that no heavy residue is formed in Knox as in Alexander. We think that this also is an immaterial difference. It is apparent that the only reason heavy residue is not produced in Knox is that he uses kerosene as a charging stock, rather

than a lower grade of hydrocarbon such as is used by Alexander.

The appellant asserts, third, that if any cracking of unvaporized oil takes place in Knox it is caused by a "super-heating medium" (the natural gas or casing head gas) in the reaction chamber, and not by the sensible heat of the cracked vapor as in Alexander. But we think this asserted difference non-existent. Knox discloses that the vapors produced by heating the charging stock in evaporators 19 and 21 ascend through pipes 42 and 43 into pipe 29 and are then carried through the heater 25 where they are themselves cracked, and that these cracked vapors, together with the cracked natural or casing head gas, descend through pipe 24 into the reaction chamber 23 where they, as well as the cracked natural or casing head gas, come into contact—obviously at the same heat as the natural or casing head gas products—with the unvaporized portion of the charging stock. They necessarily, therefore, themselves accomplish cracking. We do not think it required inventive genius, in proceeding from Knox to Alexander, to eliminate the use of natural or casing head gas as a cracking medium and to rely alone, for the liquid phase cracking, upon the heating of the cracked gases from the vapor phase cracking.

In summary: We hold that the trial court correctly held claim 32 barred by the rejection of claim 24 (as typical of claims 23–30); correctly held that claim 33 was barred by Knox; incorrectly held that claim 31 was barred by the rejection of claim 24, or by the dissolution of the interference, or by Ruff. The trial court did not rule on the question whether claim 31 was barred by Knox. Upon that we therefore make no comment.

In accordance with the foregoing the decree of the trial court is

Reversed and the case remanded for further proceedings in accordance with this opinion.